UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

VIRGIL GRIFFIN,                           )
                                          )
            *Plaintiff*,                   )
                                          )
        v.                                )        No. 1:22-cv-01666-JMS-TAB
                                          )
DENNIS REAGLE, CHARLES HOUCHINS, CHANDLER )
WILLARD, A. VOKOV, and CHRISTINA CONYERS,  )
                                          )
            *Defendants*.                  )

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Virgil Griffin was previously incarcerated at Pendleton Correctional Facility ("PCF") and alleges that the Defendants failed to protect him from assault by another inmate and retaliated against him after he wrote a letter to the Warden about his safety and filed a tort claim. Specifically, he names the following individuals as Defendants: (1) Warden Dennis Reagle; (2) Head of Internal Investigations Charles Houchins; (3) Internal Investigator Chandler Willard; (4) Counselor A. Vokov[1]; and (5) Grievance Specialist Christina Conyers. Defendants have filed a Motion for Summary Judgment as to all of Mr. Griffin's claims. [Filing No. 39.] For the reasons below, that motion is **GRANTED**.

### I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

---

[1] Although Mr. Griffin names "A. Vokov" as a defendant in his Amended Complaint, that individual's name is actually "Amber Vckov." [*See* Filing No. 40-11 (Affidavit of Amber Vckov).] The **CLERK** is **DIRECTED** to change Defendant "A. Vokov" to "Amber Vckov," and the Court will refer to her by her correct name in this Order.

as a matter of law.  *See* Fed. R. Civ. P. 56(a).  When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party.  *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant.  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

## II.
### FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Khungar*, 985 F.3d at 572-73.

### A. The Events Underlying Mr. Griffin's Claims

#### 1. Mr. Griffin Is Interviewed As Part of an Internal Investigation

In 2020, the Office of Investigations and Intelligence at PCF ("OII") was investigating Officer Kristen Carter for potentially having inappropriate relationships with prisoners. [Filing No. 40-2 at 1.] On October 6, 2020, Investigator Houchins instructed Investigator Willard to escort Mr. Griffin to the OII for a recorded interview as part of the investigation regarding Officer Carter. [Filing No. 40-2 at 1.] At that time, Mr. Griffin was in a holding cage in J Cell House while his cell was being searched. [Filing No. 40-1 at 20.]

Investigator Willard arrived at the holding cage and informed Mr. Griffin that he would be escorting him to the OII. [Filing No. 40-2 at 2.] Investigator Houchins was also present[2], and Mr. Griffin told Investigators Houchins and Willard not to escort him to the OII because it was going to create problems and be a dangerous situation for him. [Filing No. 40-1 at 21.] Mr. Griffin did not identify any specific individuals that he was concerned about or feared before he was escorted by Investigators Houchins and Willard to the OII. [Filing No. 40-1 at 21-22.] He only had general concerns that "anybody" might not like him going to the OII. [Filing No. 40-1 at 22-23.] Mr. Griffin does not recall if he continued to express concerns to OII personnel after he arrived at the OII about being harmed due to going to the OII or being interviewed. [Filing No. 40-1 at 27-28.] At the time that Mr. Griffin was interviewed by the OII, he was not a member of any gangs or affiliated groups. [Filing No. 40-1 at 23.]

---

[2] Investigator Houchins does not recall being present for the escort of Mr. Griffin to the OII, but the Court credits Mr. Griffin's deposition testimony that Investigator Houchins was present for the escort, as it must when considering Defendants' Motion for Summary Judgment.

### 2.  Mr. Griffin Is Assaulted

On October 9, 2020, Offender Tywan James and at least one other offender assaulted Mr. Griffin (the "First Assault").  [Filing No. 40-1 at 24.]  As a result of the First Assault, Mr. Griffin suffered a dislocated thumb and a laceration on his head.  [Filing No. 40-1 at 80.]  Mr. Griffin contends that the First Assault was related to other inmates finding out that he went to the OII to be interviewed.  [Filing No. 40-1 at 25-27.]

### 3.  Mr. Griffin Requests a Transfer, Receives a Conduct Report, Files a Tort Claim, and Receives a Transfer

In October 2020, Mr. Griffin requested to be transferred from PCF due to safety and security concerns.  [Filing No. 40-1 at 11.]  Mr. Griffin sent an undated, handwritten note to Warden Reagle stating, "I've been seeking a facility transfer because issues I've had with staff and offenders.  I'm very close to killing and harming someone in this facility, although I don't want to I'll be forced to do so if my concerns are continually disregarded.  My disciplinary history tells the story.  I must be transfer[r]ed.  If you all don't take what I'm saying seriously and I'm left no choice but to kill or hurt someone, not only will they and I suffer, but you all will be open to being sued by them."  [Filing No. 47 at 29.]

On December 18, 2020, Investigator Willard wrote a Conduct Report and stated "[o]n 12/18/2020 I, Investigator C. Willard, received a letter from offender Griffin, Virgil….  In this letter offender Griffin states that if he does not receive a facility transfer, he will hurt or kill someone."  [Filing No. 47 at 30.]  On January 12, 2021, Charlene Burkett, the Indiana Department of Corrections ("IDOC") Ombudsman Bureau Director, sent an email to Warden Reagle stating: "For your review.  He sent this from…tablet.  This is: Virgil Griffin….  Officials and staff at [PCF] have set me up to be killed, poisoned and placed me in a position to have to harm or kill someone so that they can use this to my disadvantage legally."  [Filing No. 47 at 33.]  Warden Reagle

4

forwarded the email to Investigator Reagle and wrote: "One to keep an eye on." [Filing No. 47 at 33.] On January 2, 2021, Counselor Vckov completed a Facility Restrictive Housing, Protective Custody and Department Wide Restrictive Housing ("DWRH") Review Form, in which she stated that Mr. Griffin should continue to be housed in restrictive housing due to "7 Day Review – CAB Pending DHB for B213." [Filing No. 47 at 35.]

Mr. Griffin submitted a Notice of Tort Claim on January 29, 2021, in which he described being brought to the OII to be interviewed on October 6, 2020 and the First Assault and states: "When I told I.I. that my life was [in danger] and [I] needed to be transferred and had my aunt Yolanda Griffin call and notify A.M. Shift Supervisor of the same thing. These officials exposed this to the prison population which resulted in my cousin Wesley Williams being set up on the streets in Gary, Indiana by people cooperating with prisoners inside [PCF], resulting in his murder." [Filing No. 47 at 36-37.] On February 4, 2021, Mr. Griffin wrote a letter to Bill Wilson, Executive Director of IDOC, stating that his life was in danger, his cousin was murdered in Gary, Indiana by inmates at PCF working with individuals "in the free world," and his family was in danger. [Filing No. 47 at 39-41.] Mr. Griffin described the OII interview and stated that afterwards, he was "labeled a snitch by prisoners and staff" and was assaulted on October 9, 2020. [Filing No. 47 at 39-41.] He stated that he contacted the facility's crime prevention line to tell them that his life was in danger and that his aunt also contacted facility shift supervisors and attempted to contact Warden Reagle to tell them that he needed to be transferred. [Filing No. 47 at 40.] He described asking for a transfer and threatening to hurt someone if he was not transferred, being confined to his cell, and having his food poisoned by staff and prisoners. [Filing No. 47 at 39-41.] He also stated "I have been writing everyone to get a transfer, however, just yesterday

Feb. 3, 2021, the PCF officials tried to force me back into the prison population in response to my external request for help and complaints." [Filing No. 47 at 41.]

On February 10, 2021, Mr. Wilson emailed Investigator Houchins, Warden Reagle, and others regarding Mr. Griffin's February 4, 2021 letter and stated "Can you review this and advise. I just need to know where we are at with this and if there is any validity to it." [Filing No. 47 at 43.] Investigator Houchins responded in a February 11, 2021 email, stating "Please see below…. If anything else is needed, please let me know." [Filing No. 47 at 46.] The attached email, from Aaron Long at IDOC to Investigator Houchins, stated:

> I conducted an investigation on Offender Griffin…. Our office received information that Offender Griffin was having an inappropriate relationship with Officer K. Carter who is still currently employed. Both the offender and staff denied this relationship. A few days after the staff and Griffin were interviewed, Griffin was trying to get to the building Officer Carter was working in. On 10/09/2020 Offender Griffin was violated by the Vice Lords Security Threat Group. The Vice Lords said the violation was for Griffin not [being] able to keep his mouth closed and that the situation is over with. On 10/27/2020 Offender Griffin did call the tips line stating he was in danger.
>
> On 12/18/2020 Offender Griffin received conduct for threatening and placed on CAB hold. Offender Griffin wrote a request slip threatening to assault staff. On 1/2/2021 Offender Griffin was found with a weapon and threatened to stab staff and moved to G Cell House.

[Filing No. 47 at 46.]

On February 12, 2021, Mr. Griffin submitted an Offender Grievance which was received by Ms. Conyers, in which [he] stated "I have repeatedly told the Warden as well as alerted the Commissioner of the D.O.C. that my presence anywhere at this facility is a threat [to] my as well as others['] safety and security, however, the Warden has ignored my complaints. Therefore, I am writing this grievance to document the negligence of the Warden and commissioner so in the event of any situation their failure to respond will be documented; that my mental and physical health is

being [neglected]."   [Filing No. 47 at 57 (emphasis omitted).]    Mr. Griffin submitted a

Classification Appeal Form on February 15, 2021 in which he stated:

> I was placed in H-cell-house cell-12 on 6A-range from G-cell-house instead of
> being transferred out [of] this prison.  I had repeatedly asked G-Cell house
> Counselor Vckov; Warden Reagle; IDOC Commissioner Carter & IDOC Executive
> Director Bill Wilson to give me an emergency transfer out of PCF because my life
> is in danger and I would have to hurt or kill someone.  Instead of transferring me I
> was moved to H-cell house to General Population although there was no reason and
> I believe it was done in retaliation because I filed a Tort Claim Notice.

[Filing No. 47 at 59 (emphasis omitted).]  The Form states that the appeal was denied, listing the

following basis: "Offender requested a transfer to ISP for during his annual review in June 2020.

His request was approved in July 2020, [b]ut no moves due to Covid.  Offender was housed in

GCH but was released to HCH on 2/5/2021 & facility records do not indicate any with (sic) the

offender since his release.  Appropriately placed review transfer request in pending movement."

[Filing No. 47 at 59.]   On February 22, 2021, Derek Christian with the IDOC Classification

Division wrote a letter to Mr. Griffin informing him that he had been approved for a transfer and

"will be transported once a bed becomes available," but that "all transfers have been affected due

to current COVID-19 procedures and precautions."  [Filing No. 47 at 56.]

Ms. Conyers completed a Return of Grievance Form on March 1, 2021, which related to

Mr. Griffin's February 12, 2021 Grievance and in which she asked Mr. Griffin: "What is [y]our

medical issue?  H[a]ve you sent in a HCR form to be seen by medical?"  [Filing No. 47 at 58.]

Mr. Griffin re-submitted his Offender Grievance Form on March 18, 2021, adding: "(The medical

issue is the fact that I have to constantly worry about my safety causing my mental health to

deteriorate because I.I. and correctional officers have labeled me a snitch and got me attacked, as

I explained in my Tort Claim Notice, and because my paranoia is legitimately founded it can't be

medicated or talked away.  My stomach is also damage[d] severely because of repeatedly being poisoned." [Filing No. 47 at 61.]

Ms. Conyers completed an Offender Grievance Response Report on March 18, 2021, in which she stated: "Per the HSA you was last seen 1/29/21 and this grievance was written on 2/12/21.  That was 10 days after you wrote this grievance[].  If there is still an issue with your health care, I advise you to submit a HR form to be seen.  Based on the above information there is no other relief I can offer.  For additional instructions and/or information regarding grievances, please refer to policy 00-02-301.  RESOLVED at facility level….  Again per HSA 3/11/21: Also you [were] seen again on 3/3/21 for stomach complaint, stool culture done and Keflex and Fibercon ordered.  You [were] seen by the Psychiatrist on 2/15/21 for a evaluation of MH meds." [Filing No. 47 at 62.]  Mr. Griffin submitted a Grievance Appeal Form on March 24, 2021, which was received by Warden Reagle, in which Mr. Griffin complained regarding the medical care he was receiving.  [Filing No. 47 at 63.]  Ms. Conyers also acknowledged receipt of the Appeal.  [Filing No. 47 at 64.][3]

### 4. The June 2021 Incident

In June 2021, Mr. Griffin and Mr. James were housed on the same housing unit/range. [Filing No. 40-1 at 70.]  Mr. Griffin had never requested that he not be housed near or around Mr. James.  [Filing No. 40-1 at 56-57.]  He cannot identify who made the decision to transfer him to the H Cell House or who caused Mr. James to be housed in the H Cell House.  [Filing No. 40-1 at 56; Filing No. 40-1 at 69-72.]

---

[3] Mr. Griffin also provided several grievances related to the medical treatment he was receiving, [*see, e.g.*, Filing No. 47 at 77], but insufficient medical treatment is not the subject of this lawsuit, [*see* Filing No. 10 at 9-10].

During that month, Mr. Griffin and Mr. James got into a physical altercation while exiting their cells for recreation and Mr. Griffin was stabbed multiple times on his head, hand, arm, leg, and side (the "Second Assault"). [Filing No. 40-1 at 67-68; Filing No. 40-1 at 83.] Other than scars and hair loss, Mr. Griffin does not have any continuing health issues related to the Second Assault. [Filing No. 40-1 at 83.] Mr. Griffin contends that the Second Assault was due to him going to the OII to be interviewed in October 2020. [Filing No. 40-1 at 68-70.]

   *5. Mr. Griffin Is Transferred From PCF*

In December 2021, Mr. Griffin was transferred from PCF to the Indiana State Prison. [Filing No. 40-1 at 9.]

**B. Investigator Willard's Role in the Events Underlying Mr. Griffin's Claims**

Investigator Willard worked as an investigator with the OII from July 2020 to May 2021 at PCF. [Filing No. 40-2 at 1.] He participated in investigations of offenders and staff members within PCF, but was not involved in the investigation of Officer Carter for potential inappropriate relationships with inmates. [Filing No. 40-2 at 1.] Before and during Investigator Willard's escort of Mr. Griffin to the OII on October 6, 2020, he did not identify any specific offenders or any offenders in general that he was concerned about or felt threatened by for coming to the OII. [Filing No. 40-2 at 2.] Investigator Willard did not know of any general group of offenders or specific offenders who would potentially harm Mr. Griffin due to him speaking to the OII or for any other reason. [Filing No. 40-2 at 2.]

Investigator Willard did not have any authority over what facilities, housing units, ranges, or cells an offender would be placed in or moved to in his role as an OII investigator. [Filing No. 40-2 at 2.] However, if the Warden asked the OII for a recommendation regarding whether a specific offender should be removed from segregated housing or if the OII was asked if certain

inmates should be housed together or not, Investigator Willard would make recommendations. [Filing No. 40-2 at 2.]  Investigator Willard did not prevent, stop, delay, or interfere with Mr. Griffin receiving a requested cell assignment change or a facility transfer.  [Filing No. 40-2 at 2.] He also did not cause or attempt to cause Mr. Griffin to be placed in close proximity to Mr. James or any other inmate that Investigator Willard knew or suspected would result in Mr. Griffin being harmed in any way.  [Filing No. 40-2 at 2.]

As part of his job duties, Investigator Willard opened the mail at the OII.  [Filing No. 40-2 at 2.]  On December 18, 2020, Investigator Willard drafted a Conduct Report charging Mr. Griffin with the offense of threatening.  [Filing No. 40-2 at 2; Filing No. 40-6.]  He drafted the Conduct Report because he had read a letter that Mr. Griffin wrote stating that he was very close to killing or harming someone at the facility and understood the letter to be an "ultimatum type threat." [Filing No. 40-2 at 2-3.]  Investigator Willard had no ulterior reason for drafting the Conduct Report.  [Filing No. 40-2 at 3.]  Mr. Griffin stated that he does not know any reason why Investigator Willard would retaliate against him.  [Filing No. 40-1 at 35-36.]

### C.  Warden Reagle's Role in the Events Underlying Mr. Griffin's Claims

During the events underlying Mr. Griffin's claims, Warden Reagle was the Warden at PCF. [Filing No. 40-7 at 1.]  Warden Reagle did not know of any general group of offenders or any specific offenders who would potentially harm Mr. Griffin.  [Filing No. 40-7 at 1.]  Warden Reagle was not involved in any way in the October 6, 2020 OII interview of Mr. Griffin.  [Filing No. 40-7 at 2.]  He did not cause or attempt to cause Mr. Griffin to be placed in close proximity to Mr. James or any other inmate that he knew or suspected would result in Mr. Griffin being harmed. [Filing No. 40-7 at 1.]  As Warden, he was rarely involved in offender placement within PCF. [Filing No. 40-7 at 1.]

At the time the Conduct Report charging Mr. Griffin with threatening was written, Warden Reagle had no knowledge of it and was not involved in any way in the Conduct Report or the disciplinary proceeding that followed. [Filing No. 40-7 at 2.] Warden Reagle also was not involved in the process of approving or denying an inmate's request for a transfer to another facility – such decisions were made by the IDOC Central Office. [Filing No. 40-7 at 2.] Beginning in May 2022, after Mr. Griffin's transfer, wardens became involved in the decision-making process for transfers of offenders to other facilities. [Filing No. 40-7 at 2.] Warden Reagle did not prevent, stop, delay, or interfere with Mr. Griffin receiving a cell assignment or a facility transfer that he requested due to concerns about his safety and security. [Filing No. 40-7 at 2.]

Warden Reagle received notifications of Notices of Tort Claims submitted by offenders from the PCF facility litigation liaison, who would coordinate the Notice of Tort Claim review process for the facility. [Filing No. 40-7 at 2.] But Warden Reagle only received notifications of Notices of Tort Claims in limited circumstances, such as when claims involved restitution of property or financial matters. [Filing No. 40-7 at 2.] He was not notified by the PCF liaison of Mr. Griffin's January 2021 Notice of Tort Claim and was not aware of it during the events that form the basis of this litigation. [Filing No. 40-7 at 2.]

### D. Investigator Houchins' Role in the Events Underlying Mr. Griffin's Claims

As Lead OII Investigator, Investigator Houchins' primary responsibility was to supervise the OII and its investigators to ensure their jobs were completed and they were following all IDOC and facility policies and procedures. [Filing No. 40-8 at 1.] When Mr. Griffin was interviewed by the OII in October 2020, Investigator Houchins did not know of any general group of offenders or specific offenders that would potentially harm Mr. Griffin due to him speaking to the OII or for any other reason. [Filing No. 40-8 at 1.]

11

In his role as OII Lead Investigator, Investigator Houchins did not have any authority over what facilities, housing units, ranges, or cells an inmate would be place in or moved to. [Filing No. 40-8 at 2.] He would only be involved if facility leadership asked the OII for a recommendation regarding whether a specific offender should be removed from segregated housing or if the OII had concerns with inmates being housed together. [Filing No. 40-8 at 2.] Under both of those circumstances, he would only provide a recommendation. [Filing No. 40-8 at 2.]

Investigator Houchins did not prevent, stop, delay, or interfere with Mr. Griffin receiving a requested cell assignment change or a facility transfer at any point. [Filing No. 40-8 at 2.] He also did not cause or attempt to cause Mr. Griffin to be placed in close proximity with Mr. James or any other inmate that Investigator Houchins knew or suspected would harm Mr. Griffin in any way. [Filing No. 40-8 at 2.]

### E. Ms. Conyers' Role in the Events Underlying Mr. Griffin's Claims

Ms. Conyers worked as a Grievance Specialist at PCF from July 2019 to September 2023. [Filing No. 40-9 at 1.] In that role, she would receive grievances from offenders and ensure that they were properly filed in accordance with IDOC policy. [Filing No. 40-9 at 1.] If the grievance was not properly filed, Ms. Conyers would return it to the offender with a brief explanation as to why it was returned and provide a chance for the offender to revise and resubmit it. [Filing No. 40-9 at 1.] If the grievance was properly filed, Ms. Conyers would enter it into the facility's online system and then a formal grievance number would be provided. [Filing No. 40-9 at 1.] If the grievance related to an individual staff member, Ms. Conyers would then send it to a supervisor. [Filing No. 40-9 at 1.] The staff member would provide a response to the grievance, which Ms. Conyers would then input and provide back to the offender through their case worker. [Filing No.

40-9 at 1-2.] If an offender appealed a grievance response, Ms. Conyers would input it into the facility's electronic system, but the warden or the warden's designee would provide the response. [Filing No. 40-9 at 2.] If an offender wrote a grievance indicating that their safety or security was being threatened by another offender or staff member, Ms. Conyers would forward the grievance to the classification team and the OII. [Filing No. 40-9 at 2.]

IDOC Policy 00-02-301 states that the following is a non-grievable issue: "Classification actions or decisions, which include loss of a job, change in security level, facility transfers, and bed moves (a separate classification appeals process is in place for this purpose)." [Filing No. 40-9 at 2.] Ms. Conyers interpreted Mr. Griffin's February 12, 2021 Grievance as a complaint that his physical and mental health were being neglected. [Filing No. 40-9 at 2.] Accordingly, she returned his grievance requesting more information about his health issue and inquiring if he submitted a health care request form. [Filing No. 40-9 at 2.]

In her role at a Grievance Specialist, Ms. Conyers did not have any authority over cell assignments or facility transfers. [Filing No. 40-9 at 2.] She played no part in any investigations done by the OII regarding Mr. Griffin and at no point did she cause or attempt to cause Mr. Griffin to be placed in close proximity with Mr. James or any other inmate that Ms. Conyers knew or suspected would harm Mr. Griffin. [Filing No. 40-9 at 2.] At no point did Ms. Conyers attempt to prevent, stop, delay, or interfere with Mr. Griffin receiving a requested cell assignment or a facility transfer. [Filing No. 40-9 at 2.]

**F. Counselor Vckov's Role in the Events Underlying Mr. Griffin's Claims**

During the time period relevant to Mr. Griffin's claims, Counselor Vckov was a caseworker at PCF in G Cell House, the segregated housing until at PCF. [Filing No. 40-11 at 1.] As a caseworker, she was involved in the initial classification of offenders, documented weekly and 30-

day reviews for offenders in administrative restricted status housing, and acted as a general liaison between offenders and the facility. [Filing No. 40-11 at 1.]

Counselor Vckov was not involved in any investigations done by the OII regarding Mr. Griffin. [Filing No. 40-11 at 1.] Counselor Vckov has no recollection of Mr. Griffin communicating his request to transfer facilities to her either verbally or in writing. [Filing No. 40-11 at 1.] If an offender informed Counselor Vckov that they would like to transfer facilities due to a risk to their safety or security, Counselor Vckov would forward the matter to the OII. [Filing No. 40-11 at 2.]

In her role as a caseworker, Counselor Vckov did not have any authority over if or when an inmate received a different cell assignment or received a facility transfer. [Filing No. 40-11 at 2.] She also did not have authority to authorize the movement of inmates out of administrative restricted status housing. [Filing No. 40-11 at 2.] At no point did Counselor Vckov cause or attempt to cause Mr. Griffin to be placed in close proximity with Mr. James or any other inmate that Counselor Vckov knew or suspected would cause harm to Mr. Griffin. [Filing No. 40-11 at 2.] Additionally, at no point did she prevent, stop, delay, or interfere with Mr. Griffin receiving a requested cell assignment or a facility transfer. [Filing No. 40-11 at 2.] Mr. Griffin does not contend that Counselor Vckov failed to forward his request to be transferred, and knows that Counselor Vckov did not have the authority to approve his facility transfer. [Filing No. 40-1 at 39-40.]

### G.  This Lawsuit

Mr. Griffin initiated this litigation on August 22, 2022, [Filing No. 1], and filed an Amended Complaint on February 27, 2023, [Filing No. 10]. The Court screened Mr. Griffin's Amended Complaint pursuant to 28 U.S.C. § 1915A, and found that the following claims would

14

proceed: (1) Eighth Amendment failure to protect and state law negligence claims against Warden Reagle, Investigator Houchins, Investigator Willard, Counselor Vckov, and Ms. Conyers; and (2) First Amendment retaliation claims against Warden Reagle and Investigator Willard.  [Filing No. 13 at 4.]

### III.
#### DISCUSSION

#### A.  Eighth Amendment Claims Against All Defendants

Mr. Griffin alleges Eighth Amendment claims against Warden Reagle, Investigator Houchins, Investigator Willard, Ms. Conyers, and Counselor Vckov.  [*See* Filing No. 13 at 3 (Court's Screening Order setting forth those claims).]  His Eighth Amendment claims relate to two events: (1) Mr. Griffin being brought to the OII to be interviewed as part of the investigation into Officer Carter, which he claims led to the First Assault; and (2) Mr. Griffin being transferred, which resulted in him being housed in close proximity to Mr. James and which he claims led to the Second Assault.  Defendants argue that they are entitled to qualified immunity on Mr. Griffin's Eighth Amendment claims because the rights Mr. Griffin claims were violated were not clearly established and because they did not violate those rights in any event.  [Filing No. 41 at 13-17.]

"A public official is entitled to qualified immunity from suit unless he [or she] violated a clearly established constitutional right." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  Whether qualified immunity applies involves two questions, which may be addressed in either order: "(1) whether the facts alleged…by the plaintiff establish a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Dockery*, 911 F.3d at 466. The Court first considers whether there is a genuine issue of material fact as to Defendants' alleged

violation of Mr. Griffin's Eighth Amendment rights, before turning – if necessary – to whether those rights were clearly established.

       *1.   Whether Defendants Violated Mr. Griffin's Eighth Amendment Rights*

         a.   <u>OII Interview</u>

            **i.  Personal Involvement - Warden Reagle, Ms. Conyers, and Counselor Vckov**

Defendants argue that Warden Reagle, Ms. Conyers, and Counselor Vckov "were not involved in any way with the OII investigation and October 6, 2020 interview regarding [Mr.] Griffin." [Filing No. 41 at 15.]

Mr. Griffin does not argue in his response that Warden Reagle, Ms. Conyers, and Counselor Vckov knew about Mr. Griffin being brought to the OII to be interviewed, instead arguing generally that Defendants caused him to be labelled a snitch. [*See* Filing No. 45.]

In their reply, Defendants reiterate their argument that Warden Reagle, Ms. Conyers, and Counselor Vckov were not involved in the OII investigation or Mr. Griffin's interview with the OII. [Filing No. 52 at 3.]

"'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.* Warden Reagle, Ms. Conyers, and Counselor Vckov all attest that they were not involved in the OII investigation. [Filing No. 40-7 at 2; Filing No. 40-9 at 2; Filing No. 40-11 at 1.] Because Mr. Griffin has not provided any contrary evidence showing that Warden Reagle, Ms. Conyers, or Counselor Vckov were involved in the OII investigation into Officer Carter or Mr. Griffin's interview as part of that investigation, the

Court **GRANTS** Defendants' Motion for Summary Judgment as to Mr. Griffin's Eighth Amendment claims against those individuals related to the OII interview.

### ii.    Violation of Eighth Amendment Rights – Investigators Houchins and Willard

In support of their Motion for Summary Judgment, Defendants argue that Mr. Griffin has not shown that Investigators Willard and Houchins knew of a substantial risk of harm to Mr. Griffin as a result of taking him to be interviewed at the OII, and that they disregarded that substantial risk. [Filing No. 41 at 15-16.] They assert that "[t]he only thing that [Mr.] Griffin told [Investigators] Willard and Houchins prior to the escort [to the OII] was that going to OII was going to create problems and be a dangerous situation for him," that he "did not identify any specific individual(s) to [them] that he was concerned about or feared if he went to the OII offices," and that he "only had general concerns that 'anybody' might not like him going to OII." [Filing No. 41 at 16.] Defendants point to the fact that Investigators Willard and Houchins did not have knowledge of any general group of offenders, or specific offenders, who would potentially harm Mr. Griffin due to him being interviewed by the OII. [Filing No. 41 at 16.]

In his response, Mr. Griffin does not argue, or provide any evidence which shows, that Investigators Willard or Houchins knew of a threat to Mr. Griffin due to being brought to the OII to be interviewed. [*See* Filing No. 45 at 4-6.]

Defendants reiterate their arguments in their reply and point to Mr. Griffin's deposition testimony, in which he stated that he did not identify any specific individuals to Investigators Willard or Houchins that he was concerned about relating to going to the OII, and that he only had general concerns that "anybody" might not like him going to the OII. [Filing No. 52 at 3-4.] They contend that Mr. Griffin has not provided any evidence that Investigators Willard or Houchins "were aware of any historical patterns of inmates being retaliated against by other inmates for

17

being escorted to OII," or "were aware of retaliation risks to an inmate for being escorted to OII for an interview regarding his own bad acts (Griffin's potential inappropriate relationship with a correctional officer)." [Filing No. 52 at 4 (emphasis omitted).][4]

Prison officials have a duty to protect inmates from violent assaults by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). They incur liability for the breach of that duty when they were "aware of a substantial risk of serious injury to [an inmate] but nevertheless failed to take appropriate steps to protect him from a known danger." *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (quoting *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)); *see also Santiago v. Walls*, 599 F.3d 749, 758–59 (7th Cir. 2010). To succeed on a claim for failure to protect, Mr. Griffin must show that (1) Investigators Willard and Houchins were aware of a substantial risk of serious injury to him, and (2) they acted with deliberate indifference to that risk. *See Farmer*, 511 U.S. at 834, 837; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). An official will only be liable when he disregards that risk by failing to take reasonable measures to abate it. *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).

Investigator Willard stated in his Affidavit that he escorted Mr. Griffin to the OII on October 6, 2020 and that Mr. Griffin did not protest being summoned for an interview, went willingly, and did not identify any specific offenders or any offenders in general that he was concerned with or felt threatened by related to being brought to the OII for questioning. [Filing No. 40-2 at 2.] Both Investigators Willard and Houchins stated that they were not aware of any general group of offenders or specific offenders that might harm Mr. Griffin due to him being interviewed by the OII or for any other reason. [Filing No. 40-2 at 2; Filing No. 40-8 at 1-2.] Mr.

---

[4] Mr. Griffin filed a Surreply, but does not discuss his Eighth Amendment claim related to being brought to the OII to be interviewed. [*See* Filing No. 57.]

Griffin has not presented any evidence to contradict these statements, or to show that either Investigator Willard or Investigator Houchins knew that there was a substantial risk that Mr. Griffin would be harmed by virtue of being escorted to the OII to be interviewed.

To the extent Mr. Griffin argues that Investigators Willard and Houchins should have known that he would be viewed as a snitch and, consequently, harmed, this is not sufficient unless Mr. Griffin can show that knowledge of the risk was inferred. *See Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008) ("[T]he inquiry is not whether individual officers should have known about risks to [plaintiff's] safety, but rather whether they did know of such risks. Even though the defendants' knowledge of the risk can be inferred, [defendant] presents no evidence showing that such an inference is appropriate.") (quotations, citations, and emphasis omitted). Mr. Griffin's only argument is that he believed he would be perceived as a snitch due to being escorted to the OII and interviewed, which would cause him to be at risk of facing harm. However, "[t]he mere fact that [an inmate] thought he was considered a snitch does not allow a factfinder to conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quotations and citations omitted).

Because Mr. Griffin has not shown that Investigators Willard or Houchins were aware of a substantial risk of injury to Mr. Griffin due to being escorted to the OII and interviewed[5], they are entitled to qualified immunity related to that activity and the Court **GRANTS** Defendants' Motion for Summary Judgment as to Mr. Griffin's Eighth Amendment claims against Investigators Willard and Houchins related to the OII interview.

---

[5] The Court notes that if Mr. Griffin's argument were successful, an inmate could never be transferred to the OII in connection with investigations. That act alone is simply not prohibited by the Eighth Amendment.

b. <u>Housing Transfers</u>

### i. **Personal Involvement – All Defendants**

In support of their Motion for Summary Judgment, Defendants argue that none of them were personally involved in placing Mr. Griffin after he requested a transfer and that "[a]t no point did any of the Defendants cause or attempt to cause [him] to be placed in close proximity with [Mr.] James, or any other inmate that they had knowledge or suspicion would result in [Mr.] Griffin being harmed in any way." [Filing No. 41 at 17.] They note that Mr. Griffin "cannot identify who specifically caused him and [Mr.] James to both be placed in H Cell House." [Filing No. 41 at 17.]

In his response, Mr. Griffin argues that he warned Warden Reagle and Investigators Willard and Houchins that he was being labeled a snitch because he had been interviewed by the OII and that he "needed to be transferred to avert these dangers." [Filing No. 45 at 4.] He notes that after he was placed in segregation for displaying a weapon and threatening staff, he "alerted [Counselor] Vckov to the history of problems and dangers that were created and asked for her help," but she did not take action. [Filing No. 45 at 5.] He also argues that he alerted Investigator Houchins during a facility tour that there was a "history of problems and dangers that were created" from the OII interview and that he was "promptly reassigned to be housed near [Mr.] James." [Filing No. 45 at 5.] Mr. Griffin asserts that he continued to complain about being in danger and to request a transfer, that he filed grievances with Ms. Conyers and appeals with Warden Reagle, and that Ms. Conyers "ignored and deflected his complaints of danger and [Warden] Reagle claimed to know of no dangers; despite both having knowledge of the history of attacks beginning in October 2020, and despite [Investigator] Houchins' acknowledgment from [Warden] Reagle that [Mr. Griffin's] situation was 'one to keep an eye on.'" [Filing No. 45 at 6.] Mr. Griffin contends

that all of the Defendants knew that he had been attacked and had complained of being in danger, but none took "reasonable protective measures, as simple as housing [him] separately from his attackers." [Filing No. 45 at 6.]

In their reply, Defendants argue that Mr. Griffin does not dispute that none of the Defendants "caused or attempted to cause [him] to be placed in close proximity with [Mr.] James, or any other inmate that they had knowledge or suspicion would result in [him] being harmed in any way." [Filing No. 52 at 4-5.] They note that Mr. Griffin does not refute that he cannot identify who caused him to be placed in H Cell House with Mr. James. [Filing No. 52 at 5.]

Mr. Griffin argues in his surreply that because the Defendants knew about "the chronology and nature of the events, role-players and legitimate concern of continued threats of danger a jury could find the defendants['] positive actions and failures to effectively avert danger was deliberately indifferent." [Filing No. 57 at 1.] He asserts that Defendants were "well aware and involved [and] actively placed and allowed [him to be] repeatedly placed in H-Cell House on the 6-A range with one of his previous aggressors for the defendants' forced trips to [OII] which motivated their belief that [he] was cooperating with prison investigators." [Filing No. 57 at 2.]

Mr. Griffin has not presented any evidence that any of the Defendants were involved in the decision to transfer him to H-Cell House, where he was in close proximity to Mr. James. Accordingly, they were not personally involved in any Eighth Amendment violation. For the sake of thoroughness, however, the Court discusses whether even if they had been involved in the decision, they knew of a substantial risk of serious harm if Mr. Griffin was transferred to be housed near Mr. James.

**ii. Violation of Eighth Amendment Rights – All Defendants**

In support of their Motion for Summary Judgment, Defendants argue that Mr. Griffin never requested that he not be housed near Mr. James.  [Filing No. 41 at 17.]  They assert that "[a]t best, [he] made statements regarding generalized risks of harm in his letter," but that "it is not clear how [he] could have expected anyone to respond to his concerns about [Mr.] James if he did not raise them."  [Filing No. 41 at 17.]

In his response, Mr. Griffin points to his grievances and to various conversations he had with some of the Defendants to support his argument that all of the Defendants knew that he was at risk of being harmed if he was transferred to be housed near Mr. James.  [Filing No. 45 at 4-6.]

Defendants reiterate their arguments in their reply, [Filing No. 52 at 5-7], and Mr. Griffin does the same in his surreply, [Filing No. 57 at 1-2].

Despite evidence that Mr. Griffin complained regarding his safety to Defendants, he has not presented any evidence that they knew which other offenders he was concerned about.  Indeed, his grievances and complaints were all vague and general and would not have alerted Defendants to concerns regarding housing Mr. Griffin near Mr. James.  And to the extent Mr. Griffin argues that Defendants should have known about the risk of housing him near Mr. James because of the First Assault, the investigation into the First Assault revealed that the Vice Lords, of which Mr. James was a member, "said the violation [the First Assault] was for Griffin not able to keep his mouth closed and that the situation is over with."  [Filing No. 47 at 46.]  This indicates that at least Warden Reagle and Investigator Houchins were led to believe that any threat from Mr. James had ended.

In short, even if Mr. Griffin could show that Defendants were involved in the decision to transfer him, which resulted in him being housed near Mr. James, he has not shown that they were

22

aware of a substantial risk of harm from that transfer.  Consequently, because a reasonable jury could not conclude that Defendants violated Mr. Griffin's Eighth Amendment rights related to his transfer, Defendants are entitled to qualified immunity on that claim.  The Court **GRANTS** Defendants' Motion for Summary Judgment as to Mr. Griffin's Eighth Amendment claims against all Defendants based on Mr. Griffin's housing transfer.

### B.  First Amendment Claims Against Warden Reagle and Investigator Willard

Mr. Griffin alleges that his First Amendment rights were violated because Warden Reagle retaliated against him for filing a Notice of Tort Claim by allowing him to be transferred within close proximity of Mr. James.  [Filing No. 10 at 10.]  He also alleges that Warden Reagle and Investigator Willard violated his First Amendment rights by retaliating against him for complaining to them about his safety and security and punishing him with a Conduct Report. [Filing No. 10 at 10.]

### 1.  Warden Reagle

Defendants argue in support of their Motion for Summary Judgment that although Mr. Griffin's letter to him regarding his safety and his Notice of Tort Claim are both First Amendment activity, Mr. Griffin does not provide any evidence that Warden Reagle engaged in an adverse action against him – *i.e.*, that he caused him to be placed near Mr. James or caused a Conduct Report to be written against him.  [Filing No. 41 at 19.]  Additionally, they argue that during the times relevant to Mr. Griffin's claims, Warden Reagle was not aware of the Notice of Tort Claim. [Filing No. 41 at 20.]  They argue further that Warden Reagle "was not the cause of or involved in any way in [Mr.] Griffin receiving a conduct report in December 2020 for the offense of threatening," and that at time the Conduct Report was written, Warden Reagle had no knowledge of it.  [Filing No. 41 at 20.]

In his response, Mr. Griffin asserts that after he complained about his safety, Warden Reagle "still had [Investigator] Willard…write [him] up on a disciplinary report for threatening in his letter" and "took disciplinary action and placed him on 'Red-Tag' cell restriction status." [Filing No. 45 at 7.] He points to an April 20, 2021 email from Warden Reagle to Penny Eden with IDOC, in which Warden Reagle states: "Offender Griffin was being investigated for fraternization with Officer Carter here at the facility…. I&I performed the investigation based on offender Griffin[']s actions and followed proper procedures when Offender Griffin mentioned the threat to him. He was treated for injuries which at the time he stated was from falling. Offender Griffin's moves to GCH and HCH were in accordance with his conduct history and as part of the investigation." [Filing No. 47 at 48.] Mr. Griffin asserts that this email shows that his complaints were a motivating factor for his transfer. [Filing No. 45 at 8.]

Defendants reiterate their arguments in their reply, [Filing No. 52 at 7-8], and Mr. Griffin reiterates his arguments in his surreply, [Filing No. 57].

To succeed on a First Amendment retaliation claim, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action. *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 668, 680 (7th Cir. 2020). If they can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

Warden Reagle does not dispute that Mr. Griffin engaged in protected First Amendment activity by writing a letter regarding his safety or by filing a Notice of Tort Claim. [*See* Filing No. 41 at 19.] The Court focuses on the third element – whether the protected activity was a motivating factor in Warden Reagle's decision to take the allegedly retaliatory action.

"The motivating factor [element] amounts to a causal link between the activity and the unlawful retaliation." *Manuel*, 966 F.3d at 680. This element may be proven by circumstantial evidence, which may include suspicious timing; ambiguous statements, behavior, or comments directed at others in the protected group; evidence that similarly situated people were treated differently; and evidence that the decisionmaker offered a pretextual reason for an allegedly retaliatory action. *Id.*; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013). Nonetheless, "[a]llegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech." *Stagman v. Ryan*, 176 F.3d 986, 999–1000 (7th Cir. 1999).

"Suspicious timing alone will rarely be sufficient to create a triable issue because suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Manuel*, 966 F.3d at 680 (cleaned up) (standing alone, the fact that inmate's cell was shaken down nine minutes after he engaged in First Amendment protected activity could not create triable issue of fact as to retaliation claim because another, non-retaliatory motive existed.)

As for Mr. Griffin's letter to Warden Reagle, which Mr. Griffin alleges caused Warden Reagle to write a Conduct Report, Mr. Griffin has not provided any evidence that Warden Reagle had anything to do with the Conduct Report. Instead, Investigator Willard wrote the Conduct Report and stated that the threatening charge was based on a letter that Mr. Griffin wrote to him.

[Filing No. 47 at 30.]   And although Warden Reagle received the letter also, there is still no evidence that he instructed Investigator Willard to write the Conduct Report.  Indeed, he states in his Affidavit that he did not cause the Conduct Report to be written, was not involved in any way in the Conduct Report, and was not even aware of the Conduct Report when it was written or the disciplinary matter when it was adjudicated.  [Filing No. 40-7 at 2.]

For Mr. Griffin's claim that Warden Reagle retaliated against him for filing a Notice of Tort Claim by causing him to be transferred so that he was in close proximity to Mr. James, Mr. Griffin again has not produced any evidence that Warden Reagle was involved in the decision to transfer Mr. Griffin.  And, significantly, Warden Reagle states in his Affidavit that he only received notifications regarding Notices of Tort Claims "in limited circumstances such as when claims involved restitution of property or financial matters," and that he was not aware of Mr. Griffin's Notice of Tort Claim during the times relevant to Mr. Griffin's claims but only learned of it from PCF's litigation liaison.  [Filing No. 40-7 at 2.]

Because a reasonable jury could not conclude that Mr. Griffin's protected activities of writing a letter regarding his safety and filing a Tort Claim Notice were the motivating factor in Warden Reagle's decision to take any action, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Mr. Griffin's First Amendment retaliation claims against Warden Reagle.

### 2.  *Investigator Willard*

Defendants argue that although Mr. Griffin's letter to Warden Reagle (and received by Investigator Willard) is protected under the First Amendment, he cannot show that it was the sending of the letter, rather than the content of the letter (which contained a threat) that was the motivating factor in Investigator Willard writing the Conduct Report.  [Filing No. 41 at 18.]  They

assert that Mr. Griffin has not identified a reason why Investigator Willard would retaliate against him. [Filing No. 41 at 18.]

In his response, Mr. Griffin notes that Investigator Willard wrote the Conduct Report after reviewing Mr. Griffin's letter. [Filing No. 45 at 7.]

Defendants reiterate their arguments in their reply, [Filing No. 52 at 7], as does Mr. Griffin in his surreply, [Filing No. 57].

The Court focuses on whether the protected activity (Mr. Griffin writing the letter regarding his safety) was a motivating factor in Investigator Willard's decision to write a Conduct Report. It is undisputed that Investigator Willard wrote the Conduct Report because Mr. Griffin threatened in the letter to "hurt or kill someone" if he was not transferred. [Filing No. 47 at 30.] But in order for the Conduct Report to have been retaliatory, it must have been written simply because Mr. Griffin wrote the letter complaining about his safety, and not because of the contents of the letter. *See Holleman v. Zatecky*, 951 F.3d 873, 879 (7th Cir. 2020) ("Establishing the causation element of retaliation requires a showing that the fact of the plaintiff's engagement in protected activity was a motivating factor of the alleged adverse action, not merely that the substance of the plaintiff's complaint motivated a response the plaintiff did not particularly like. To hold otherwise would absurdly result in requiring prison officials to respond to every grievance by enacting the prisoner's preferred solution, rather than allowing officials to exercise their own judgment."). Investigator Willard wrote the Conduct Report because Mr. Griffin's letter contained a threat, not because of the mere fact that Mr. Griffin wrote the letter. If this was considered retaliation under the First Amendment, an offender could never be disciplined for writing a threatening letter to the Warden.

Because no reasonable jury could conclude that Investigator Willard wrote the Conduct Report because Mr. Griffin wrote the letter – rather than because of the substance of the letter – the Court **GRANTS** Defendants' Motion for Summary Judgment as to Mr. Griffin's First Amendment retaliation claim against Investigator Willard.

### C. Negligence Claims Against All Defendants

Mr. Griffin asserts negligence claims against all Defendants in both their official and individual/personal capacities.  [*See* Filing No. 10 at 2.]  Because the Court has dismissed Mr. Griffin's constitutional claims, it first considers whether it will exercise supplemental jurisdiction over his remaining state-law negligence claims.  That decision is within the Court's discretion.  28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim…if…the district court has dismissed all claims over which it has original jurisdiction."); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is entirely discretionary.").  "Indeed, when the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016).

When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in every case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quotations and citations omitted).  In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Elecs. v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal

claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (quotation and citation omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quotation and citation omitted).

Here, it is absolutely clear how Mr. Griffin's negligence claims should be decided so the Court, in its discretion, exercises supplemental jurisdiction over those claims.

### 1. Official Capacity Claims

Defendants argue that the Indiana Tort Claims Act ("ITCA") provides immunity for any liability in their official capacities under state law. [Filing No. 41 at 20-21.]

Mr. Griffin does not respond to Defendants' argument in his response, [*see* Filing No. 45], and Defendants reiterate their arguments in their reply, [Filing No. 52 at 8-9].

Under the ITCA, a "lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Ind. Code § 34-13-3-5(b). Put differently, there is no remedy against individual employees so long as they were acting within the scope of their employment. *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014). Accordingly, Defendants are immune from liability in connection with Mr. Griffin's negligence claims against them in their official capacities and the Court **GRANTS** Defendants' Motion for Summary Judgment on those claims.

### 2. *Personal Capacity Claims*

Defendants argue that Mr. Griffin does not specifically allege that they were acting clearly outside the scope of their employment and that, even if he had, he has not produced evidence showing that any of their actions were taken outside the scope of their employment. [Filing No. 41 at 21.] They assert that, in any event, they did not breach any duty owed to Mr. Griffin either in connection with the OII interview or the housing placement. [Filing No. 41 at 22-24.]

Mr. Griffin does not address Defendants' arguments in his response, [*see* Filing No. 45], and Defendants reiterate their arguments in their reply, [Filing No. 52 at 8-9].

The ITCA standard for scope of employment is broad: if an employee's conduct is "of the same general nature as that authorized, or incidental to the conduct authorized," then it is considered within the scope of employment. *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 453 (Ind. 2000). And as explained above, if an employee was acting within the scope of employment, the claim is barred by the ITCA. *Ball*, 760 F.3d at 645. Here, there is no evidence that Defendants, who were carrying out their duties at PCF, acted outside the scope of their employment. Accordingly, Mr. Griffin's negligence claims against Defendants in their personal capacities fail as a matter of law and the Court **GRANTS** Defendants' Motion for Summary Judgment on those claims.

## IV.
### Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment, [39], is **GRANTED**. Final judgment shall enter accordingly.

Date: 2/25/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**<u>Distribution via ECF only to all counsel of record</u>**

**<u>Distribution via United States Mail to</u>:**

Virgil Griffin
#998996
Indiana State Prison
Inmate Mail/Parcels
One Park Row
Michigan City, IN 46360